# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PIERCE HARRISON, | ) |
| Plaintiff, | ) |
| v. | ) 02: 10-cv-1569 |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER OF COURT

February 8, 2012

**I.  INTRODUCTION**

Plaintiff, Pierce Harrison, brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 – 1383f ("Act"). This matter comes before the court on cross motions for summary judgment. (ECF Nos. 6, 8). The record has been fully developed at the administrative level. For the following reasons, Plaintiff's Motion for Summary Judgment is GRANTED in part and DENIED in part, and Defendant's Motion for Summary Judgment is DENIED.

## II. PROCEDURAL HISTORY

Plaintiff initially filed an application for SSI in which he claimed total disability since June 1, 1992. (R. at 63 – 69)[1]. An administrative hearing was held on January 7, 2010 before Administrative Law Judge William E. Kenworthy ("ALJ"). Plaintiff was represented and testified at the hearing. (R. at 23 – 33). Tanya Sholo, an impartial vocational expert, also testified. (R. at 23 – 33).

On January 19, 2010, the ALJ rendered an unfavorable decision to Plaintiff in which he found that Plaintiff retained the ability to perform a full range of work at all exertional levels with certain nonexertional limitations, and, therefore, was not "disabled" within the meaning of the Act.

The decision of the ALJ became the final decision of the Commissioner on October 12, 2010, when the Appeals Council, denied Plaintiff's request to review the decision of the ALJ.

On November 24, 2010, Plaintiff filed his Complaint in this Court in which he seeks judicial review of the decision of the ALJ. Defendant filed an Answer on February 11, 2011. The parties have filed cross motions for summary judgment.

## III. STATEMENT OF THE CASE

### A. General Background

Plaintiff was born on July 3, 1953, and was fifty six (56) years of age at the time of his administrative hearing. (R. at 87). Plaintiff obtained his GED in 1973, but has no post-secondary education or vocational training. (R. at 95 – 96). Plaintiff lived independently in an apartment. (R. at 106). He has four children, but has never been married. (R. at 148). Plaintiff

---

[1] Citations to ECF Nos. 3 – 3-7, the Record, *hereinafter*, "R. at __."

had not worked since 2001 when he was employed as a general laborer through temp agencies. (R. at 92). He has a significant history of incarcerations for drug-related and assaultive behavior. (R. at 237, 288).

Plaintiff claims that his primary barrier to maintaining full-time work is his mental state. (R. at 91). When asked to describe his limitations specifically, Plaintiff stated: "You'd have to be around me to find that out. I'm a character. I have mood swings and that's why things happen." (R. at 92). Plaintiff stated that his mental issues began affecting his ability to work "sometime in the 90's." (R. at 92).

In a self-report of functional capacity, Plaintiff claimed that he had irregular sleep patterns, but he had no problems with personal care, he could make simple meals, he could clean laundry, he went outside frequently to walk or use mass transit, he could go shopping, he handled his own bills and savings, and he could count change. (R. at 106 – 13). Plaintiff expressed an interest in reading, and read his Bible daily. (R. at 106 – 13). Plaintiff avoided social situations. (R. at 106 – 13). Plaintiff believed that his age had affected his ability to concentrate. (R. at 106 – 13). He reportedly did not handle stress or changes in routine well. (R. at 106 – 13). Plaintiff did not indicate that he suffered from any other psychological issues. (R. at 106 – 13).

### B. Treatment History

Plaintiff received psychiatric care from two sources prior to filing his claim of disability. His earliest treatment records in the medical record are from Allegheny Correctional Health Services, Inc. ("ACHS"). (R. at 209 – 32, 272, 288 – 89). Plaintiff was incarcerated for possession of illegal substances with the intent to distribute in Allegheny County, Pennsylvania for approximately eleven-and-one-half months ending July 17, 2008. (R. at 209 – 32, 272, 288 –

3

89). Initially, Plaintiff was not on any psychiatric medications, and his only reported psychiatric treatment in the past came about during previous incarcerations. (R. at 133 – 45). ACHS reported that Plaintiff had most recently been abusing heroin and methadone. (R. at 133 – 45). He went through a detoxification program, although he did not complain of withdrawal symptoms. (R. at 133 – 45). During the course of his incarceration, ACHS generally noted Plaintiff to be alert and his behavior to be appropriate. (R. at 133 – 45). He did not worry about major life problems, did not exhibit signs of depression, was not overly anxious, afraid, or angry, and did not have difficulty speaking. (R. at 133 – 45). However, he was irritable and did not believe that he had anything to look forward to in the future. (R. at 133 – 45). ACHS started Plaintiff on psychiatric medications. (R. at 133 – 45).

Following his release from prison, Plaintiff was placed on probation and was ordered to attend outpatient substance abuse counseling at Mercy Behavioral Health ("Mercy") of Pittsburgh, Pennsylvania. (R. at 236). While there, Plaintiff was primarily under the care of psychiatrist Holly Stewart, M.D., and therapist Aaron Beckley. On August 1, 2008, a treatment plan was formulated by Plaintiff's psychiatrist and therapist. (R. at 209 – 32, 288 – 89).

Plaintiff initially reported little difficulty concentrating, coping with problems, and managing day-to-day life. (R. at 209 – 32, 288 – 89). He reported significant difficulty getting along with family, but only a little difficulty getting along with non-family and social groups. (R. at 209 – 32, 288 – 89). Plaintiff was somewhat confident, and occasionally depressed and nervous, but never suicidal. (R. at 209 – 32, 288 – 89). He did not report racing thoughts, delusions, hallucinations, mood swings, or the urge to hurt himself. (R. at 209 – 32, 288 – 89). Plaintiff sometimes felt that people were watching him and often thought that people were

4

against him.  (R. at 209 – 32, 288 – 89).  He endorsed occasional homicidal ideation, but not recently.  (R. at 209 – 32, 288 – 89).

Plaintiff reported a history of alcohol use – his last drink being the day prior to his initial evaluation.  (R. at 209 – 32, 288 – 89).  He had three drinks, two or three times per week.  (R. at 209 – 32, 288 – 89).  Plaintiff had last used cocaine one year prior to his evaluation, and had last used hallucinogens and marijuana in the 1970's.  (R. at 209 – 32, 288 – 89).  He had a significant history of heroin abuse, which he had last used in June 2007.  (R. at 209 – 32, 288 – 89).  He consumed one bag of heroin twice per day.  (R. at 209 – 32, 288 – 89).  Plaintiff had never attended Alcoholics Anonymous or Narcotics Anonymous.  (R. at 209 – 32, 288 – 89).  He considered his past drug and alcohol abuse to have cost him former jobs.  (R. at 209 – 32, 288 – 89).

Mercy staff noted that Plaintiff exhibited impaired hygiene, impaired articulation by way of mumbling, reduced eye contact and guarded behavior, irritability, incoherent or disorganized thoughts, paranoia, and impaired judgment and insight with respect to his treatment needs; but, Mercy staff also noted normal perceptions, appropriate affect, and normal intellectual functioning.  (R. at 209 – 32, 288 – 89).  Identified goals of treatment included complete sobriety and mood stabilization.  (R. at 209 – 32, 288 – 89).  Plaintiff was considered to be at high risk for relapse, and experienced impairment in most life areas due to drug abuse.  (R. at 209 – 32, 288 – 89).  He exhibited moderate homicidal ideation, and his paranoia and disorganized thoughts were consistent with schizophrenia.  (R. at 209 – 32, 288 – 89).  Plaintiff was considered to be in immediate need of individual psychiatric treatment and medication.  (R. at 209 – 32, 288 – 89).  Plaintiff's primary diagnoses were polysubstance abuse and schizophrenia.  (R. at 209 – 32, 288

5

– 89). He was given a global assessment of functioning ("GAF") score of 39[2]. (R. at 209 – 32, 288 – 89).

On August 6, 2008, shortly after his intake at Mercy, on August 6, 2008, Plaintiff was examined for the Bureau of Disability Determination by state agency evaluator Charles M. Cohen, Ph.D. (R. at 147 – 53). Dr. Cohen noted that he considered Plaintiff to be guarded throughout the examination and seemed to be preoccupied and withholding information. (R. at 147 – 53). Plaintiff had poor eye contact, reported that he had not abused any illicit substances since his incarceration in June 2007, and informed Dr. Cohen that he had recently begun treatment at Mercy. (R. at 147 – 53). Plaintiff was very vague in his descriptions of psychological symptoms, but generally indicated that he did not feel well, lacked motivation, did not trust other people, and often was hostile and aggressive toward others. (R. at 147 – 53). Plaintiff isolated himself and did not talk to others. (R. at 147 – 53). Plaintiff flatly denied suicidal thoughts. (R. at 147 – 53).

---

[2] The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 91 – 100 exhibits "[s]uperior functioning in a wide range of activities" and "no symptoms;" of 81 – 90 exhibits few, if any, symptoms and "good functioning in all areas," is "interested and involved in a wide range of activities," is "socially effective," is "generally satisfied with life," and experiences no more than "everyday problems or concerns;" of 71 – 80, may exhibit "transient and expectable reactions to psychosocial stressors" and "no more than slight impairment in social, occupational, or school functioning;" of 61 – 70 may have "[s]ome mild symptoms" or "some difficulty in social, occupational, or school functioning, but generally functioning pretty well" and "has some meaningful interpersonal relationships;" of 51 – 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 41 – 50 may have "[s]erious symptoms (e.g., suicidal ideation …)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 31 – 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood;" of 21 – 30 may be "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., … suicidal preoccupation)" or "inability to function in almost all areas;" of 11 – 20 may have "[s]ome danger of hurting self or others" or "occasionally fails to maintain minimal personal hygiene" or "gross impairment in communication;" of 1 – 10 may have "[p]ersistent danger of severely hurting self or others" or "persistent inability to maintain minimal personal hygiene" or "serious suicidal act with clear expectation of death." *Id.*

Upon examination, Dr. Cohen observed that Plaintiff was passive-aggressive, and somewhat depressed. (R. at 147 – 53). Plaintiff was not suffering hallucinations or delusions, he had normal thought productivity, and he was goal-directed and coherent. (R. at 147 – 53). Plaintiff was fully alert and oriented. (R. at 147 – 53). His abstract thinking and general fund of knowledge were below average, but his recall, memory, and ability to perform simple math was good. (R. at 147 – 53). Concentration and task persistence were good. (R. at 147 – 53). His ability to handle stress was questionable. (R. at 147 – 53). Plaintiff's insight into his condition was limited, and his reliability was very questionable. (R. at 147 – 53). Plaintiff's judgment was fair, however. (R. at 147 – 53). Dr. Cohen noted that Plaintiff walked to his examination, but stated that he could take mass transit if necessary. (R. at 147 – 53). Plaintiff lived alone and was capable of self-care. (R. at 147 – 53).

Dr. Cohen diagnosed Plaintiff with mixed substance dependency, and personality disorder with paranoid and aggressive features. (R. at 147 – 53). Dr. Cohen noted that he did not have the benefit of reviewing Plaintiff's medical files prior to completing his assessment. (R. at 147 – 53). He was able to conclude, however, that Plaintiff appeared capable of appearing for work in a timely fashion, but could not work with the public, be subject to intensive supervision or teamwork, or attempt more than moderately complex tasks. (R. at 147 – 53). If awarded disability, Dr. Cohen believed that Plaintiff should receive benefits through an intermediary so that funds would not be misappropriated to purchase illicit substances. (R. at 147 – 53). In all other respects, Plaintiff was considered to be only slightly or moderately limited in his functioning. (R. at 147 – 53).

In September 2008, therapy notes from Mercy indicated that Plaintiff's affect and mood were flat, his eye contact was poor, he was irritable, depressed, and short tempered, and he had

7

trouble sleeping. (R. at 272 – 73, 278 – 87). Plaintiff made it known that he was only seeking treatment because his probation officer required him to attend. (R. at 272 – 73, 278 – 87). He had relapsed into heroin use that month. (R. at 272 – 73, 278 – 87). Plaintiff's GAF score was 45. (R. at 272 – 73, 278 – 87).

On September 29, 2008, a mental residual functional capacity ("RFC") assessment was completed by state agency evaluator Phyllis Brentzel, Psy.D.. (R. at 157 – 60). Dr. Brentzel reviewed Plaintiff's medical records and the findings of Dr. Cohen. (R. at 157 – 60). She concluded that Plaintiff was only moderately to not significantly limited in all areas of functioning, and that Dr. Cohen had over-estimated Plaintiff's degree of restriction with respect to Plaintiff's ability to make personal and social adjustments. (R. at 157 – 60). Dr. Brentzel believed that Plaintiff was capable of maintaining full-time work. (R. at 157 – 60). She opined that Plaintiff's memory was not impaired, and he could understand and carry out simple instructions, make simple decisions, maintain regular attendance, maintain attention and concentration, work without special supervision, and engage in production oriented jobs. (R. at 157 – 60). Additionally, Plaintiff's activities of daily living and social skills were functional, and he was self-sufficient. (R. at 157 – 60).

In October 2008, therapy notes from Mercy indicated that Plaintiff was still irritable and guarded. (R. at 175 – 208, 236 – 38, 268 – 71). Plaintiff refused to answer some of the therapist's questions and disagreed with most of the therapist's suggestions. (R. at 175 – 208, 236 – 38, 268 – 71). Plaintiff was not particularly interested in communicating with the therapist, and sometimes made nonsensical statements. (R. at 175 – 208, 236 – 38, 268 – 71). Plaintiff mentioned that he had begun to engage in volunteer work and was trying to provide help to a nephew. (R. at 175 – 208, 236 – 38, 268 – 71). Plaintiff claimed that, even though he had

8

the opportunity, he had not recently abused any illicit substances. (R. at 175 – 208, 236 – 38, 268 – 71). Plaintiff indicated that his relapse into heroin abuse in September was limited by a lack of funds. (R. at 175 – 208, 236 – 38, 268 – 71). He admitted that he was in financial distress. (R. at 175 – 208, 236 – 38, 268 – 71). He did not have difficulty with transportation, meeting his needs, or performing chores. (R. at 175 – 208, 236 – 38, 268 – 71). The therapist noted that Plaintiff was in need of medication. (R. at 175 – 208, 236 – 38, 268 – 71).

On October 20, 2008, Plaintiff met with his psychiatrist. (R. at 175 – 208, 236 – 38, 268 – 71). Dr. Stewart recorded Plaintiff's claims of depression, paranoia, poor sleep, and lack of trust. (R. at 175 – 208, 236 – 38, 268 – 71). Plaintiff was guarded and irritable during questioning. (R. at 175 – 208, 236 – 38, 268 – 71). Plaintiff was not suicidal, but admitted to homicidal ideation in the past. (R. at 175 – 208, 236 – 38, 268 – 71). He reported sobriety for approximately one month. (R. at 175 – 208, 236 – 38, 268 – 71). Plaintiff's only significant period of sobriety since he was a teenager was his most recent incarceration. (R. at 175 – 208, 236 – 38, 268 – 71). Plaintiff never entered any rehabilitation programs and admitted that his addictions had cost him past jobs. (R. at 175 – 208, 236 – 38, 268 – 71).

Dr. Stewart observed Plaintiff to be tense and short. (R. at 175 – 208, 236 – 38, 268 – 71). He made poor eye contact. (R. at 175 – 208, 236 – 38, 268 – 71). He was basically cooperative except when asked certain questions, at which point he would become confrontational and vaguely threatening. (R. at 175 – 208, 236 – 38, 268 – 71). His grooming was fair to poor. (R. at 175 – 208, 236 – 38, 268 – 71). Psychomotor activity was normal, his mood was unremarkable, his affect was restricted and somewhat hostile, his speech was normal, his thoughts were organized for the most part, he suffered paranoid delusions, was alert and

9

oriented, exhibited intact cortical functions, and showed poor insight and judgment. (R. at 175 – 208, 236 – 38, 268 – 71).

Dr. Stewart ultimately diagnosed Plaintiff with polysubstance dependence and schizophrenia. (R. at 175 – 208, 236 – 38, 268 – 71). She assessed a GAF score of 45 at that time – but found that the highest over the previous year was 50. (R. at 175 – 208, 236 – 38, 268 – 71). She opined that despite Plaintiff's dependency problems and psychological issues, Plaintiff did not appear to actively engage in the recovery process. (R. at 175 – 208, 236 – 38, 268 – 71). Although Plaintiff attended treatment regularly, he was unwilling to talk to Dr. Stewart about treatment methods and refused to consider medication. (R. at 175 – 208, 236 – 38, 268 – 71). Dr. Stewart stressed that use of an antipsychotic medications would be the primary and most helpful means of treatment for Plaintiff's psychological disturbance. (R. at 175 – 208, 236 – 38, 268 – 71).

The medical evidence of record also includes the therapy notes from Mercy extending through May 8, 2009. (R. at 239 – 67). The notes indicate that Plaintiff's mood and affect drifted between appropriate and flat. (R. at 239 – 67). At times, he became more talkative and less irritable. (R. at 239 – 67). He acknowledged that he had issues with anger and trust. (R. at 239 – 67). He claimed that his family did not want him to own a firearm because of his anger. (R. at 239 – 67). Yet, Plaintiff continued to disagree with his therapist's suggestions and remained very guarded. (R. at 239 – 67). Overall, Plaintiff's participation was minimal. (R. at 239 – 67). He reported avoiding social situations; however, he also reported volunteer work, spending time and helping elderly neighbors with chores, and inviting his daughter to live with him because she was having relationship difficulties. (R. at 239 – 67). Plaintiff denied cravings for illicit substances. (R. at 239 – 67). Plaintiff's GAF scores ranged from 43 – 46. (R. at 239 –

67). Plaintiff's probation was extended for an additional seven months during this time period. (R. at 239 – 67).

Plaintiff's second, and final, visit with Dr. Stewart was on September 9, 2009. (R. at 274 – 77). At that time, she indicated that Plaintiff was psychotic, extremely paranoid, guarded, experiencing slight loosening of associations, angry, and cognitively rigid. (R. at 274 – 77). Plaintiff still refused psychiatric medications. (R. at 274 – 77). Dr. Stewart further found that Plaintiff had a blunt, flat affect, poverty of content of speech, generalized persistent anxiety, mood disturbance, psychomotor agitation or retardation, apprehensive expectation, paranoid thinking or inappropriate suspiciousness, perceptual or thinking disturbance, paranoid hallucinations or delusions, deeply ingrained, maladaptive patterns of behavior, pathologically inappropriate suspiciousness or hostility, easy distractibility, sleep disturbance, and oddities of thought, perception, speech, and behavior. (R. at 274 – 77). Dr. Stewart indicated that Plaintiff either was unable to meet competitive standards of employment or had no useful ability to function with respect to nearly all aspects of Plaintiff's capacity for work. (R. at 274 – 77). She felt that Plaintiff would miss at least four days of work per month. (R. at 274 – 77). Plaintiff's GAF score was considered to be 35 at that time. (R. at 274 – 77).

On December 18, 2009, Plaintiff's therapist wrote a letter indicating that Plaintiff had been regularly attending outpatient therapy at Mercy. (R. at 290). He stated that Plaintiff had bi-weekly therapy sessions, that Plaintiff had been fully compliant with treatment, that Plaintiff met with Dr. Stewart, and that Plaintiff had been taking psychiatric medications. (R. at 290). Plaintiff's therapist felt that Plaintiff was fully compliant. (R. at 290).

### C. Administrative Hearing

At the administrative hearing, Plaintiff testified that on a typical day, if he was not seeing a doctor, he took trips to the library and Salvation Army. (R. at 27). Plaintiff enjoyed walking, in general, and often walked around town. (R. at 27). Plaintiff shopped for his own groceries. (R. at 29). He enjoyed reading novels – detective/ mystery novels, in particular. (R. at 28). Outside of personal hobbies, Plaintiff also spent time doing volunteer work. (R. at 28). He performed chores for an elderly, quadriplegic neighbor, and worked with St. Vincent de Paul delivering care packages to senior citizens. (R. at 28).

In terms of treatment, Plaintiff explained that he visited Mercy twice per month for meetings with his therapist. (R. at 29). He did not attend group meetings such as Alcoholics Anonymous or Narcotics Anonymous. (R. at 29 – 30). He explained that he did not do well around groups of people, and was generally uncomfortable with others. (R. at 30).

Following Plaintiff's testimony, the ALJ asked the vocational expert whether a hypothetical person of Plaintiff's age, educational background, and work experience could perform a significant number of jobs in the national economy if limited to work involving no more than simple, repetitive tasks, and no interaction with the general public or close interaction or cooperation with co-workers. (R. at 31). The vocational expert responded that a number of jobs would be available to such a person, including that of "machine presser," with 90,000 positions available in the national economy, that of "hand packager," with 800,000 positions available, and that of "sorter," with 300,000 positions available. (R. at 31 – 32). Plaintiff's counsel followed-up by asking the vocational expert whether any jobs would be available to the hypothetical person if he or she would miss work at least four times per month. (R. at 32). The vocational expert replied that such a person would be terminated from employment. (R. at 32).

**IV.     STANDARD OF REVIEW**

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §404.1520(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[3], 1383(c)(3)[4]; *Schaudeck v.*

---

[3]     Section 405(g) provides in pertinent part:

*Comm'r Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart,* 312 F.3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial

---

<p style="padding-left: 2em;">Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business</p>

42 U.S.C. § 405(g).

4     Section 1383(c)(3) provides in pertinent part:
<p style="padding-left: 2em;">The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.</p>

42 U.S.C. § 1383(c)(3).

evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d. Cir. 1986).

**V.    DISCUSSION**

In his decision, the ALJ concluded that Plaintiff suffered from severe medically determinable impairments in the way of a psychotic disorder – not otherwise specified ("NOS") - and a history of substance abuse disorder. (R. at 17). The ALJ further concluded that while Plaintiff was capable of a full range of work at all exertional levels, his impairments limited him to jobs involving only simple, repetitive tasks, no interaction with the general public, and minimal interaction with co-workers. (R. at 18). Based upon the testimony of the vocational expert, the ALJ determined that despite the aforementioned limitations, Plaintiff would still qualify for a significant number of jobs in existence in the national economy. (R. at 21 – 22). Therefore, the ALJ concluded that Plaintiff was not disabled and, therefore, not entitled to benefits. (R. at 21 – 22).

Plaintiff objects to the determination of the ALJ, arguing that reversible error was committed when the ALJ failed to discuss – at any length – records from Plaintiff's treatment at Mercy, and when the ALJ failed to accord proper weight to undisputed medical evidence indicating that Plaintiff was completely disabled. The Court notes that when rendering a decision, an ALJ must provide sufficient explanation of his or her final determination to provide a reviewing court with the benefit of the factual basis underlying the ultimate disability finding. *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981) (citing *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 94 (1943)). The ALJ need only discuss the most pertinent, relevant evidence bearing upon a

15

claimant's disability status, but must provide sufficient discussion to allow the court to determine whether any rejection of potentially pertinent, relevant evidence was proper. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 203 – 04 (3d Cir. 2008) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000); *Cotter*, 642 F.2d at 706). In the present case, the Court finds that the ALJ did not meet his responsibilities under the law.

As noted by Plaintiff, the ALJ fails to make any significant mention of Plaintiff's treatment at Mercy, although the treatment notes from Mercy constitute the majority of a relatively concise medical record – approximately one hundred pages. (R. at 175 – 232, 239 – 73, 278 – 90). The Court recognizes that our appellate court has held that an ALJ cannot be held responsible for making reference to every relevant treatment note and that the discussion should necessarily be limited to only the most pertinent, probative evidence of record. *Fargnoli v. Massanari*, 247 F. 3d 34, 42 (3d Cir. 2001); *Johnson v. Comm'r of Soc. Sec.*, 529 F. 3d 198, 203 – 04 (3d Cir. 2008). *See also Phillips v. Barnhart*, 91 Fed. App'x 775, 780 n. 7 (3d Cir. 2004) ("A written evaluation of every piece of evidence is not required, as long as the ALJ articulates at some minimum level her analysis of a particular line of evidence. Moreover, the ALJ's mere failure to cite specific evidence does not establish that the ALJ failed to consider it.") (citations omitted).

However, the present case is clearly distinguishable from *Fargnoli*, in which the ALJ was not held accountable for failure to discuss every relevant note in a voluminous record. *Fargnoli*, 247 F. 3d at 42. The record here is hardly voluminous, and for the ALJ to simply gloss over the most significant portion of it – containing approximately one year of therapy notes – deprives this Court of its ability to determine whether "significant probative evidence was not credited or simply ignored." *Cotter*, 642 F. 2d at 705. To conclude that such an opinion is supported by

substantial evidence "approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" *Stewart v. Sec'y of Health, Educ. and Welfare*, 714 F. 2d 287, 290 (3d Cir. 1983) (quoting *Arnold v. Sec'y of Health, Educ. and Welfare*, 567 F. 2d 258, 259 (4th Cir. 1977)). A more thorough analysis of Plaintiff's medical record is, therefore, required.

With respect to Plaintiff's second argument, that the ALJ failed to accord proper weight to undisputed medical evidence, the Court finds that it need not now address this issue in light of the ALJ's failure to provide a proper discussion of the entire record.

## VI. CONCLUSION

Based upon the foregoing, the ALJ did not provide sufficient justification from the medical record and Plaintiff's personal testimony to allow this Court to conclude that substantial evidence supported his decision. "On remand, the ALJ shall fully develop the record and explain [his or her] findings… to ensure that the parties have an opportunity to be heard on the remanded issues and prevent *post hoc* rationalization" by the ALJ. *Thomas v. Comm'r of the Soc. Sec.,* 625 F. 3d 798, 800 – 01 (3d Cir. 2010). *See also Ambrosini v. Astrue*, 727 F. Supp. 2d 414, 432 (W.D. Pa. 2010). Testimony need not be taken, but the parties should be permitted input via submissions to the ALJ. *Id.* at 801 n. 2.

Accordingly, Plaintiff's Motion for Summary Judgment is granted, in part, and denied, in part; Defendant's Motion for Summary Judgment is denied without prejudice; and, the decision of the ALJ is vacated and the case remanded for further consideration consistent with this opinion. An appropriate Order follows.

McVerry, J.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PIERCE HARRISON, | ) |
| Plaintiff, | ) |
| v. | ) 02: 10-cv-1569 |
| MICHAEL J. ASTRUE,<br>Commissioner of Social Security, | ) |
| Defendant. | ) |

## ORDER OF COURT

**AND NOW**, this 8th day of February, 2012, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED, AND DECREED** that:

1. Plaintiff's Motion for Summary Judgment is GRANTED, in part, and DENIED, in part. The decision of the ALJ is VACATED and the case REMANDED for further consideration consistent with this opinion

2. Defendant's Motion for Summary Judgment is DENIED without prejudice.

3. The Clerk will docket this case as closed.

BY THE COURT:

s/ Terrence F. McVerry
United States District Judge

cc: Kelly C. Schneider, Esq.
Robert Peirce & Associates, P.C
Email: kschneider@piercelaw.com

Christy Wiegand,
Assistant U.S. Attorney
Email: Christy.wiegand@usdoj.gov